**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| Ashley Ford<br>137 Lincoln Ave.<br>Cuyahoga Falls, OH 44221.<br><br>    and<br><br>David West<br>1001 Elm Avenue<br>Columbia, SC 29205.<br><br>On behalf of Themselves and all Others<br>similarly situated,<br><br>   Plaintiffs,<br><br>v.<br><br>Pennsylvania Higher Education Assistance<br>Agency d/b/a FedLoan Servicing<br>C/O CT Corporation System Dauphin<br>116 Pine Street, Suite 320<br>Harrisburg, PA 17101<br><br>   Defendant. | Civil Action No.: 5:17-cv-49<br><br>Judge:<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY DEMAND ENDORSED HEREIN** |

     Plaintiffs, Ashley Ford and David West, (collectively, "Plaintiffs") by their undersigned counsel, file this Class Action Complaint on behalf of themselves and all others similarly situated (the "Class" as defined below) against Pennsylvania Higher Education Assistance Agency d/b/a FedLoan Servicing ("Defendant" or "PHEAA" or "FedLoan"). All allegations herein, other than those relating directly to Plaintiffs, are based on information and belief.

**INTRODUCTION**

1

1. This action seeks to protect teachers. Teachers are a vital centerpiece to the success and growth of this country. The strength of every profession grows out of the knowledge and skills that teachers instill in our country's youth. Yet, teachers are too often underappreciated, undercompensated, and undervalued. Worse, teachers are being taken advantage of and cheated by PHEAA.

2. Recognizing the need for teachers in high-need subject areas at low-income schools, Congress established the Teacher Education Assistance for College and Higher Education (TEACH) Grant program under the College Cost Reduction and Access Act.[1] The TEACH Grant program awards financial grants to college students who agree to teach in the high-need subject areas at these low-income schools for four years. If, for some reason, a student participating in the TEACH program chooses not to fulfill their obligation, the grant is converted into a loan.

3. The federal government hired PHEAA to be the exclusive servicer of the TEACH grants beginning in July 2013. As of June 30, 2015, PHEAA was servicing about $444.5 million in TEACH Grants.

4. As TEACH administrator, PHEAA was obligated to receive certain certifications from teachers verifying compliance with their obligations under the TEACH Grant program and ensure that the Government also held up their end of the bargain.

5. Rather than properly administering these grants, Defendant instituted a fraudulent and deceptive pattern and practice of converting grants into interest-bearing loans, despite the fact that TEACH grant recipients fulfilled and continue to fulfill their teaching obligations in these high-need fields and low-income schools in compliance with their TEACH obligations.

---

[1] *See* 20 U.S.C. § 1070g-2.

6. Worse, once notified about its wrongful conversion of a TEACH grant to a loan, PHEAA further fails to honor the TEACH grants – and further breaches its TEACH plan-related duties and obligations – by refusing to convert the loan back to a grant and failing to offer any recourse for these teachers as they continue to honor their teaching obligations.

7. As a result of PHEAA's wrongful conduct, Plaintiffs and the other Class members are saddled with improperly converted, interest-bearing loans, on which PHEAA requires them to make monthly payments, even though they continue to fulfill their teaching obligations.

8. PHEAA has abused, and continues to abuse, the TEACH Grant program, the teachers, and the education system in order to increase the value of its portfolio and, commensurately, to increase its profits at the expense of Plaintiffs and other Class members, who have held up their end of the bargain only to be cheated by PHEAA for its own financial gain. Plaintiffs and the other Class members have been damaged by PHEAA's unfair, deceptive, and illegal conduct in an amount to be determined at trial.

***Plaintiff Ashley Ford***

9. Ashley Ford entered into the TEACH Grant program on September 2, 2009 while she was working on her master's degree at Kent State University.

10. In order to receive a TEACH Grant, Ms. Ford executed a TEACH Grant Agreement to Serve, which sets forth the parties' rights and obligations under the TEACH Grant program. A true and accurate copy of her agreement is attached as Exhibit A hereto.

11. Ms. Ford received $7,000 in Grants over three years under the TEACH Grant program.

12. In exchange for the $7,000 in grants, Ms. Ford agreed to teach:

    a.   in a high-need field;

b.  at an elementary school, secondary school, or educational service agency that serves students from low-income families;

c.  for at least four complete academic years within eight years after completing (or ceasing enrollment in) the course of study for which she received the grant.[2]

13. Additionally, Ms. Ford agreed to "submit evidence of such employment in the form of a certification by the chief administrative officer of the school upon completion of each year of such service."[3] ("certification paperwork").

14. If Ms. Ford failed to satisfy her teaching obligation, the TEACH Grant would be converted to an unsubsidized loan that the she would be required to pay back, with capitalized interest accruing from the date the TEACH Grant was initially disbursed to her.

15. It is not in dispute that Ms. Ford has met all of her teaching requirements as outlined in her TEACH Grant Agreement to Serve.

16. Ms. Ford is a special education teacher at Stanton Middle School in Kent, Ohio.

17. Stanton Middle School is and was designated as a low-income school by the Annual Directory of Designated Low-Income Schools for Teacher Cancellation Benefits. (*See* page 2 of Exhibit A)

18. Special education is a high-need field, as specifically enumerated in Ms. Ford's Agreement to Serve. (*See* page 3 of Exhibit A.).

19. In her second to last year of serving under the Grant, PHEAA, through their servicing entity, FedLoan, fraudulently converted her grants into loans for allegedly failing to submit her certification paperwork.

---

[2] *Id.* ; (Exhibits A, B).
[3] *Id.* at § 1070g-2(b)(1)(D).

20. Ms. Ford received her certification paperwork while on maternity leave, which required her to ask a co-worker to get the paperwork, take it into school to get her principal's signature, and return it to her, which she did.

21. Ms. Ford was caring for her new born child and she inadvertently left a single signature from the paperwork.

22. FedLoan Servicing mailed her new paperwork, informing her that she would need to complete and submit all new paperwork rather than simply returning her old paperwork so that she could add the one missing signature.  When she received the second set of paperwork, she was still on maternity leave.

23. She faxed the second set of paperwork to FedLoan as soon as practical due to her maternity leave and spoke to someone by phone at FedLoan who assured her that it would not be an issue.

24. However, due to this minute inadvertence in her first set of paperwork, and contrary to the assurances that she received, FedLoan converted her Grants into Loans in December of 2014.

25. Ms. Ford immediately spoke with a representative at FedLoan about her situation and they informed her that she should send a dispute letter. On January 9, 2015, she sent a dispute letter and spoke with a representative that informed her that she would be contacted after her case was reviewed and a decision was made.

26. On April 6, 2015, she called FedLoan to inquire about the status of her case.  She was told that the representative at FedLoan who had received her dispute letter had not submitted it correctly, therefore, it had never been reviewed.  The new representative corrected the mistake while she was on the phone with Ms. Ford and stated that she

should "receive information about her case within thirty days, although it sometimes takes longer."

27. On June 11, 2015, Ms. Ford called FedLoan again to check on the status of her dispute and was told that it was still under review. On July 2, 2015, she called FedLoan and was told that her dispute was denied, although she was never notified of this. The representative that she spoke with asked that she submit paperwork verifying that she was in fact on maternity leave when her original paperwork was due.

28. On July 13, 2015, Ms. Ford faxed paperwork regarding her time off of work and was told that she should receive a decision within thirty days, which she did not.

29. FedLoan has still not converted her Loans back into Grants even though Ms. Ford has done everything that has been asked of her, including, most importantly, continuing to fulfill her teaching obligation. In fact, Ms. Ford has completed her four-year teaching obligation as outlined in the Agreement to Serve and continues to teach in a high-need field at Stanton Middle School, a low-income school.

30. Ms. Ford is now burdened not only with the repayment of a $7,000 loan but also with repayment of all accrued interest, which amounts to an additional $1,997.09.

31. Because of the burden of having to repay these loans, Ms. Ford has had to ask for a forbearance of the loan repayment, which will result in the continued accrual of interest.

32. This is a quintessential example of PHEAA's scheme to defraud teachers – wait for any minute mistake, then convert the Grant into a Loan – charging years of accrued interest, and then make it absolutely impossible to resolve the dispute.

***Plaintiff David West***

33. Plaintiff David West entered into the TEACH Grant program on December 20, 2010, while he was a student at the University of South Carolina.

34. In order to receive the TEACH Grant, Mr. West executed a TEACH Grant Agreement to Serve, which sets forth the parties' rights and obligations under the TEACH Grant program. A true and accurate copy of her agreement is attached as Exhibit B hereto.

35. Mr. West received a $4,000.00 grant under the TEACH Grant program.

36. In exchange for the $4,000 in grants, Mr. West agreed to teach:

    a. in a high-need field;

    b. at an elementary school, secondary school, or educational service agency that serves students from low-income families;

    c. for at least four complete academic years within eight years after completing (or ceasing enrollment in) the course of study for which he received the grant.[4]

37. Additionally, Mr. West agreed to "submit evidence of such employment in the form of a certification by the chief administrative officer of the school upon completion of each year of such service."[5] ("certification paperwork").

38. If Mr. West failed to satisfy his teaching obligation, the TEACH Grant would be converted to an unsubsidized loan that the he would be required to pay back, with capitalized interest accruing from the date the TEACH Grant was initially disbursed to him.

39. It is not in dispute that Mr. West has met all of his teaching requirements as outlined in his TEACH Grant Agreement to Serve.

---

[4] *Id.* ; (Exhibits A, B).
[5] *Id.* at § 1070g-2(b)(1)(D).

40. Mr. West began teaching at White Knoll High School in August of 2012.

41. White Knoll High School is and was designated as a low-income school by the Annual Directory of Designated Low-Income Schools for Teacher Cancellation Benefits. (*See* page 3 of Exhibit B).

42. Mr. West teaches Art, which is and was a field listed in the Teacher Shortage Area Nationwide Listing. (*See* page 3 of Exhibit B).

43. Mr. West believes in the mission behind the TEACH Grant program, i.e. to provide high quality teaching to low income schools that otherwise may not be able to recruit quality teachers such as Mr. West.

44. However, despite holding up his obligations under the Agreement to Serve, PHEAA improperly converted his grant into an interest-bearing loan.

45. While filling out his certification paperwork, Mr. West also inadvertently left out a signature, and the Principal of his school inadvertently left out the start and end dates of the academic year that was being certified.

46. When Mr. West was informed of this, he immediately took action to correct the mistake and informed PHEAA that he was in fact continuing to uphold his obligations.

47. Despite PHEAA being aware of this information, it still improperly converted his Grants into Student loans, charging him with $809.14 in accrued interest and a principal balance of $4,000.

48. Mr. West is now burdened with the repayment of a $4,000 loan and the $809.14 in accrued interest, $62 per month over 10 years, despite the fact that Mr. West has completed his four-year teaching obligation as outlined in the Agreement to Serve and continues to teach in a high-need field at White Knoll High School, a low-income school.

49. Mr. West also went through the torment that is working with PHEAA, to no avail.

50. Mr. West exhausted all internal options through PHEAA and FedLoan, including working through FedLoan Servicing's Ombudsman Liaison line for the U.S. Department of Education Office of the Ombudsman. However, FedLoan concluded that the TEACH loan "cannot be transferred back to a Grant."

51. Because Mr. West continues to dispute the legitimacy of PHEAA's actions in improperly converting his Grants to Loans, and has refused, and continues to refuse to make payments on the improperly converted Loans, he has been threatened with wage garnishment, tax refund confiscation, legal action by the United States Department of Justice, and notification of default to the major credit bureaus.

52. Thus, again, pursuant to its scheme, PHEAA attempts to profit off of the hard work of teachers who are teaching in low-income schools in high-need fields who are attempting to mold children into successful adults.

## JURISDICTION & VENUE

53. This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because it is a civil class action, the aggregate amount in controversy exceeds $5 million exclusive of interest and costs, and diversity of citizenship exists between Plaintiffs and PHEAA.

54. Venue is proper here because PHEAA regularly conducts business in this District and a substantial part of the events giving rise to the claims occurred here.[6]

55. This Court has personal jurisdiction over PHEAA because PHEAA conducts business throughout the United States, including this District, has substantial contacts with this District, and has engaged in the illegal scheme explained herein that was directed at and

---

[6] 28 U.S.C. § 1391(b)(2).

had the intended effect of causing injury to persons and entities residing in, located in, or doing business in this District.

56. This Court has original jurisdiction pursuant to 28 U.S.C.A § 1331 and 18 U.S.C.A. § 1964(c).

57. Venue is proper in this jurisdictional district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District and because PHEAA is subject to personal jurisdiction in this judicial district.

## PARTIES

*Plaintiffs*

58. Ashley Ford (f/k/a Ashley Cessna; "Ms. Ford") is an Ohio citizen residing at 137 Lincoln Ave., Cuyahoga Falls, Ohio, 44221. Ms. Ford was accepted into the TEACH Grant program and received $7,000 in grants. She began teaching at Stanton Middle School in Kent, Ohio in August 2006, and continues to teach there. FedLoan Services converted her grant into a loan on or around December 9, 2014. Despite holding up her end of the bargain for many years, FedLoan refuses to reconvert the loans to grants due to a minute technicality.

59. David West ("Mr. West") is a South Carolina citizen, residing at 1001 Elm Avenue, Columbia, South Carolina 29205. Mr. West was accepted into the TEACH Grant program and received a $4,000 grant. He began teaching in August 2012 at White Knoll High School in Lexington, South Carolina and continues to teach there. Mr. West's TEACH Grant was wrongfully converted into a loan on December 17, 2013. Mr. West has repeatedly attempted to resolve the problem with FedLoan, to no avail.

*Defendants*

60. PHEAA was created in 1963 by the Pennsylvania General Assembly and is an independent political subdivision, which is self-described as a governmental instrumentality, engaged in non-governmental commercial activity throughout the United States, including the state of Ohio. PHEAA is engaged in nationwide commercial student-loan financial services. Upon information and belief, PHEAA is registered to do business in the state of Pennsylvania, entity number 619191. PHEAA is financially independent of the state of Pennsylvania, generates its own commercial revenue, and makes its own fiscal and policy decisions.

61. PHEAA established FedLoan Servicing – which shares its headquarters with PHEAA at 1200 North Seventh Street, Harrisburg, Pennsylvania, 17102 – to support the U.S. Department of Education's ability to service student loans owned by the federal government. According to its website, FedLoan Servicing is the exclusive servicer approved by the U.S. Department of Education to service these loans, and it is "dedicated to supporting borrowers with easy and convenient ways to manage their student loans." [7]

## FACTUAL ALLEGATIONS

62. "The U.S. Department of Education estimates that our country will need approximately 430,000 new elementary and secondary teachers by the year 2020, particularly in high-need subject areas such as mathematics, science, and special education."[8]

---

[7] https://myfedloan.org/about/index.shtml (as of 9/7/2016).
[8] U.S. Gov't Accountability Office, GAO-15-314, Higher Education: Better Management of Federal Grant and Loan Forgiveness Programs for Teachers Needed to Improve Participant Outcomes, 1 (2015) (hereinafter "GAO-15-314").

63. The TEACH Grant program, established by the College Cost Reduction and Access Act, was created to attract and retain qualified teachers for high-need subject areas at low-income schools.[9]

64. Pursuant to federal statute, a TEACH Grant assists students in paying for the cost of their education by providing grants of up to $4,000 per year to students who are completing or plan to complete course work needed to begin a career in teaching and who agree to teach in a low-income school in a high-need field. Undergraduate students are eligible for a maximum of $16,000 in grants, while graduate students can receive up to $8,000 in TEACH Grants. As of 2015, more than $593 million in grants have been awarded since the start of the program.[10]

65. High-need fields include bilingual education and English language acquisition, foreign language, mathematics, reading specialist, science, and special education, as well as any other field that has been identified as "high-need" by the federal government, a state government, or a local education agency, and that is included in the annual Teacher Shortage Area Nationwide Listing (Nationwide Listing).[11]

66. In order to receive a TEACH Grant, individuals must sign a TEACH Grant Agreement to Serve, which sets forth the parties' rights and obligations under the TEACH Grant program. A true and accurate copy of such an agreement is attached as Exhibit A hereto.

67. For example, pursuant to the TEACH Grant contract, individuals agree to teach:

    a. in a high-need field;

    b. at an elementary school, secondary school, or educational service agency that serves students from low-income families;

---

[9] *See* 20 U.S.C. § 1070g-2.
[10] GAO-15-314.at pg.8.
[11] 20 U.S.C. § 1070g-2(b).

     c.  for at least four complete academic years within eight years after completing (or ceasing enrollment in) the course of study for which you received the grant.[12]

68. Additionally, participants must "submit evidence of such employment in the form of a certification by the chief administrative officer of the school upon completion of each year of such service."[13] ("certification paperwork").

69. If a TEACH Grant recipient fails to satisfy his or her teaching obligation, that recipient's TEACH Grant is converted to an unsubsidized loan that the recipient must pay back, with capitalized interest accruing from the date the TEACH Grant was initially disbursed to that recipient.

### *PHEAA'S Role as Loan Servicer*

70. Student loan servicers are a crucial link between borrowers and lenders. Servicers – such as PHEAA – manage borrowers' accounts, process monthly payments, manage enrollment in alternative repayment plans, and communicate directly with borrowers, including borrowers in distress.

71. The federal government contracts with loan servicers, such as PHEAA, to assist in administering TEACH Grants. PHEAA administers the TEACH Grants and handles payments, billing, and communications with the recipients. PHEAA's duties also include reminding TEACH Grant recipients when their paperwork is due.

72. PHEAA can initiate the conversion of the grant into the loan.  Almost all of the TEACH Grants – including all of the unsubsidized, interest-bearing loans at issue here – are administered by PHEAA.

---

[12] *Id.* ; (Exhibits A, B).
[13] *Id.* at § 1070g-2(b)(1)(D).

73. Despite taking on this substantial responsibility and obligation, PHEAA has utterly failed to perform its duties as a loan servicer and to honor its obligations under the TEACH Grant program.

74. Among other things, PHEAA fails to adequately communicate with TEACH Grant recipients, fails to appropriately and timely notify recipients about their certification paperwork, and fails to appropriately determine whether grants should be converted to loans.

75. Rather than honoring the TEACH Grants when teachers are complying with their obligations, PHEAA intentionally, improperly, and illegally converts those grants into interest-bearing loans and refuses to reconvert the loan to a grant for those teachers holding up their end of the bargain. The conversion usually comes during the last two years of the teacher's four year obligation.

76. Many loan servicers, like PHEAA, are compensated by receiving a percentage of the unpaid balances of the loans they service. By converting TEACH Grants to loans, PHEAA increases the unpaid balance of loans it services, thereby illegally increasing its own revenues at the expense of Plaintiffs and other Class members.

77. PHEAA fraudulently entered into these Agreements to Serve with TEACH Grant recipients with the intention of improperly converting the grant into a loan for its own financial benefit.

*PHEAA's Pattern and Practice of Improper Conversions*

78. A 2015 U.S. Government Accountability Office ("GAO") report that analyzed servicer data for TEACH Grants found that more than one-third of the recipients had their grants converted to interest-bearing loans.[14]

79. As September 2014, at least 2,252 grants were erroneously converted to loans.[15] The majority of these erroneous conversions occurred because the servicer failed to give the recipient 30 days from the final notification to certify that the recipient was teaching or intended to teach. Instead, PHEAA converted the grant to a loan within the 30-day window in which the recipient is permitted to respond.

80. PHEAA commonly communicated with TEACH Grant recipients via U.S. Mail.

81. Further, additional servicer errors for improperly converted grants include converting the grant to a loan before certification was due, failure to give the recipient 45 days from the first notice to certify, or a failure to give the recipient a full year from graduation to certify teaching.

82. A prime example of PHEAA's illegal loan conversion conduct occurred at an elementary school in Idaho where every TEACH Grant recipient had his or her grant converted to a loan. In a rural Idaho elementary school of 32 certified teachers, seven teachers had received the TEACH Grant. *All* seven of those "grants" have been converted to unsubsidized loans.[16]

83. "[The U.S. Department of] Education established a dispute process to address concerns about TEACH Grants converted to loans in error, however, GAO found that [the U.S.

---

[14] GAO-15-314.
[15] *Id.*
[16] Jennifer Zamora, *Feds Unfairly Convert Teacher Grants to Loans*, Idahoednews.org, May 26, 2014, available at: http://www.idahoednews.org/voices/feds-unfairly-convert-grants-to-loans/

Department of] Education and the servicer provide incomplete and inconsistent information to recipients about the availability of and criteria for disputing conversions. This is inconsistent with federal internal control standards that highlight effective external communication."[17]

84. A separate independent study similarly found that nearly 40% of all students who have been awarded TEACH Grants have had their grants converted into loans.[18]

85. This is not the first time that PHEAA has been accused of improperly servicing government loans. An ongoing False Claims Act case involves allegations of PHEAA illegally inflating its loan portfolios to obtain higher subsidies from the federal government.[19]

### PHEAA's Failure to Reconvert Loans

86. PHEAA further fails to provide any appropriate recourse for the victims of its erroneous conversions. Thus, Plaintiffs, and the other Class members are left with interest-bearing loans and no recourse.

87. Although PHEAA supposedly provides a *de jure* appeal process, the *de facto* appeal process is nonexistent. PHEAA erroneously tells recipients that once a grant is converted to a loan, it cannot be reinstated as a grant. PHEAA further fails to explain reasons that a conversion could be deemed erroneous, how the problem would be rectified, or the criteria considered in the adjudication process.

88. Worse, despite continuing to teach in high-need fields at low-income schools, because of PHEAA's illegal conversion activities, Plaintiffs and the other Class members are now

---

[17] GAO-15-314
[18] *See* Tamara Hiler and Lanae Erickson Hatalsky, *TEACH Grant Trap: Program to Encourage Young People to Teach Falls Short*, Third Way, Jan. 13, 2015, available at: http://www.thirdway.org/memo/teach-grant-trap-program-to-encourage-young-people-to-teach-falls-short.
[19] *See U.S. ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 745 F.3d 131 (4th Cir. 2014).

forced to make monthly payments on their converted loans or face wage garnishments, tax refund confiscation, and negative credit reporting consequences.

89. Rather than properly service the TEACH Grants and adhere to the program, PHEAA is stifling the program's intent for its own economic interest and punishing teachers who continue to fulfill their TEACH Grant obligations.

90. Between the beginning of the TEACH Grant program in the 2008-2009 school year and October 2014, more than 112,000 students have received grants, and the number of students increased in the following years. However, after PHEAA began servicing the program in July 2013, participation in the program has been declining.

91. For example, in 2012 there were 20,670 undergraduate participants. In 2014, there were 17,055 participants, marking a 3,615 or a 17% participant decrease.  In 2012, there were 18,471 graduate participants. In 2014, there were 16,089 participants, marking a 2,382 or roughly a 13% participant decrease.[20]

92. Plaintiffs and the other Class members are recipients of these TEACH Grants and agreed to fulfill their obligation to teach in these high-need fields at low-income schools. Plaintiffs and the other Class members fulfilled or are continuing to fulfill their teaching obligations.

93. PHEAA's improper conversions of these grants to interest-bearing loans has devastating consequences for Plaintiffs and the other Class members, including significant monthly payments and negative impacts on credit history.

## CLASS ACTION ALLEGATIONS

94. Pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), Plaintiffs bring this action on behalf of themselves and all others similarly situated. The class is defined as :

---

[16] *See* GAO-15-314 at pg. 14.

> All persons in the United States who received a TEACH Grant serviced by PHEAA and who submitted documentation demonstrating they are fulfilling their obligation, and had their grant converted to an interest-bearing loan from July 2013 to present.

95. Excluded from the Class are PHEAA and its officers, directors, management, employees, subsidiaries or affiliates, any Judge to whom this action is assigned and any member of such Judge's staff and immediate family, PHEAA's counsel and their families, and all federal governmental entities.

96. Members of the class are so numerous and geographically dispersed that joinder is impracticable. Upon information and belief, there are thousands of Class Members as more than 2,000 grants have been improperly converted, at minimum. Further, the Class is readily identifiable from information and records maintained by PHEAA.

97. Plaintiff's claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class were damaged by the same wrongful conduct of PHEAA. Plaintiff's claims and claims of the putative Class originate from the same fraudulent and unfair practices of PHEAA. If brought and prosecuted individually, the claims of each putative class member would necessarily require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief. Plaintiffs would fairly and adequately protect the interests of the members of the putative class.

98. PHEAA acted on grounds generally applicable to the entire Class, therefore injunctive relief is appropriate. Such generally applicable conduct is inherent in PHEAA's wrongful conduct.

99. Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members. Questions of law and fact common to the Class include but are not limited to:

    a. Whether PHEAA's conduct in fraudulently converting grants into loans violates the Racketeer Influenced Corrupt Organizations Act.

    b. Whether PHEAA's conduct breaches the contracts entered into by PHEAA and Plaintiffs;

    c. Whether PHEAA's conduct constitutes unjust enrichment;

    d. Whether Plaintiffs and the Class are entitled to recover compensatory, statutory, treble, and/or putative damages based on PHEAA's conduct alleged herein;

    e. Whether Plaintiffs and the Class are entitled to injunctive relief enjoining PHEAA from further engaging in unfair and deceptive practices alleged herein;

    f. Whether Plaintiff and the putative Class are entitled to recover attorney's fees.

100. These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class Members, including legal and factual issues  relating to liability and damages.

101. PHEAA's conduct was  generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

102. This class action is superior to any alternatives for the fair and efficient adjudication of this controversy. There will be no material difficulty in the management of this action as

a class action. Class treatment will also permit the adjudication of relatively small claims by Class Members who otherwise could not afford to litigate the claim, such as those asserted herein. Prosecution as a class action will eliminate the possibility of repetitive litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, effectively, and without the duplication of effort and expense that numerous individual actions would produce.

103. The prosecution of separate actions by individual Class Members would create the risk of inconsistent or varying judgments, establishing incompatible standards of law for PHEAA.

104. Class action treatment also is superior to any alternative method to compensate the victims of PHEAA's unlawful conduct – Plaintiffs and the proposed Class – for the injuries they have suffered as a direct result of PHEAA's conduct.

## COUNT I

### RICO § 1962(c)

105. Plaintiffs incorporate and re-allege all other paragraphs in this Complaint by reference as though fully rewritten herein.

106. Defendant is liable to Plaintiffs under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*, ("RICO").

107. PHEAA is an enterprise as defined by 18 U.S.C. § 1961(4).

108. PHEAA is engaged in and its activities affect interstate commerce.

109. PHEAA did conduct and participate in the conduct of the PHEAA's affairs through a pattern of racketeering activity for the unlawful purpose of intentionally defrauding Plaintiff.

110. Specifically, Defendant committed mail fraud under 18 U.S.C.A. § 1341.

111. On December 17, 2013, Defendant fraudulently converted Mr. David West's TEACH Grant to a Direct Unsubsidized Loan.

112. Defendant used U.S. Mail in furtherance this fraudulent scheme.

113. On December 9, 2014, Defendant fraudulently converted Ms. Ford's TEACH Grant to a Direct Unsubsidized Loan.

114. Defendant used U.S. Mail to further this fraudulent scheme.

115. Defendant committed fraud by inducing Plaintiffs to accept the TEACH Grant   and teach at qualified schools in high-need subject fields knowing it was going to unjustifiably convert these Grants into unsubsidized, interest bearing loans.

116. Defendant's representations that these Grants would not be converted to loans was material to the scheme to defraud Plaintiffs.

117. Defendant knowingly converted these loans without justification.

118. The acts of converting Mr. West and Ms. Ford's Grants into loans, set forth above, constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

119. These illegal conversions constitute at least two predicate acts in an ongoing scheme.

120. Defendants are engaged in an open-ended scheme to fraudulently convert many TEACH Grants into interest bearing loans.

121. The illegal conversion of TEACH Grants into loans is part of Defendant's way of doing business.

122. Defendants continue to fraudulently convert TEACH Grants into interest bearing loans.

123. Defendant has directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above in violation of 18 U.S.C. § 1962(c).

124. As a direct and proximate result of the Defendant's racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property in that these Grants are now allegedly due and owing and have been accruing interest from when Plaintiffs signed the Agreement to Serve. (Exhibit A and B).

125. Plaintiffs are entitled to damages, treble damages, punitive damages, attorney's fees, and costs for PHEAA's violations.

## COUNT II

### Breach of Contract

126. Plaintiffs incorporate and re-allege, as though fully set forth herein, each of the paragraphs set forth above.

127. Plaintiffs and Class members entered into a contract with PHEAA entitled Agreement to Serve. (Representative copies of the contract are attached as Exhibits A and B).

128. Pursuant to Section C, item 1, of the contract each participant in the TEACH grant program agreed to fulfill a service obligation of teaching for four years in a low-income school, high need field, and meet the requirements for a high-quality teacher.

129. Pursuant to Section C, item 2, of the contract each participant in the TEACH grant program is required to provide the U.S. Department of Education with certification of their teaching after completing each of the four required school years.

130. Plaintiffs and Class members have performed or substantially performed all material terms of their obligations under the contract.

131. Despite plaintiffs and class member substantially complying with the contract PHEAA breached its duty by improperly converting the grants to interest-bearing loans.

132.  As a proximate consequence of PHEAA's improper conduct in breaching the contract, the Plaintiffs and Class members suffered injury.

## COUNT III

### Unjust Enrichment

133. Plaintiffs incorporate and re-allege, as though fully set forth herein, each of the paragraphs set forth above.

134. PHEAA has been unjustly enriched by receiving increased profits based on increased outstanding loan balances at the expense of Plaintiffs and Class members.

135. PHEAA has been unjustly enriched by gaining qualified teachers in high need areas.

136. PHEAA has knowingly, improperly, and unreasonably received and retained a benefit to the detriment of Plaintiffs and Class members. PHEAA's retention of these profits is inequitable.

137. PHEAA has knowingly, improperly, and unreasonably received and retained the benefit of having qualified teachers in high need areas but is enriched by illegally prohibiting these teachers from receiving the benefit of the TEACH Grant.

138. As a proximate consequence of PHEAA's improper conduct, the Plaintiffs and Class members were injured. PHEAA has been unjustly enriched and retention of funds under these circumstances would be unjust without payment.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs and Class members pray that the Court:

A. Certify this action as a Class Action pursuant to Federal Rule of Civil Procedure 23, and appoint Plaintiffs as Class Representatives and its counsel of record as Class Counsel;

B. Permanently enjoin PHEAA from sending collection letters to Plaintiffs or any member of the class, converting any grant to a loan for any member of the class, filing negative information with any credit reporting agency with regard to Plaintiffs or any member of the class, or collecting any payment from Plaintiffs or any member of the class;

C. Enter judgment for the damages sustained by Plaintiffs and the Class defined herein, and for any additional damages, and penalties and other monetary relief provided by applicable law, including treble damages;

D. For an order requiring PHEAA to institute a corrective review process to remedy PHEAA's wrongful conduct;

E. Award Plaintiffs and Class members pre-judgment and post-judgment interest as provided by law, including that such interest be awarded at the highest legal rate from and after the date of service of the complaint in this action;

F. Award Plaintiffs and Class members damages, treble damages, punitive damages, attorney's fees; and

G. Award such other relief as the Court deems just and proper.

Dated: January 6, 2017

Respectfully submitted,
DOUCET & ASSOCIATES CO., LPA

s/ Troy J. Doucet_____
Troy J. Doucet (0086350)
*Attorney for Plaintiffs Ashely Ford et al.*
700 Stonehenge Parkway, 2B
Dublin, Ohio 43017
(614) 944-5219 PH
(818) 638-5548 FAX
Troy@TroyDoucet.com

## JURY TRIAL DEMANDED

Plaintiffs respectfully request a jury trial on all triable issue.

s/ Troy J. Doucet_____
Troy J. Doucet (0086350)