UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ASHLEY FORD, et al., | ) | CASE NO. 5:17-cv-49 |
| | ) | |
| PLAINTIFFS, | ) | JUDGE SARA LIOI |
| vs. | ) | |
| | ) | MEMORANDUM OPINION AND ORDER |
| PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY, et al., | ) | |
| DEFENDANTS. | ) | |

Before the Court is the motion of defendant Pennsylvania Higher Education Assistance Agency ("PHEAA") to dismiss Counts I and III of the Second Amended Complaint ("SAC"). (Doc. No. 22 ["Mot."].) Plaintiffs oppose the motion (Doc. No. 26 ["Opp'n"]), and PHEAA has filed a reply. (Doc. No. 27 ["Reply"].) For the reasons that follow, the motion to dismiss is granted.

I. **BACKGROUND**

All facts are taken from plaintiffs' SAC (Doc. No. 17) and the two contracts at issue in this case, which the Court may properly consider without converting PHEAA's motion to dismiss to one for summary judgment as they are referenced in the pleadings and integral to the complaint allegations.

A. **The TEACH Grant Program and the Agreement to Serve**

"Recognizing the need for teachers in high-need subject areas at low-income schools," Congress established the Teacher Education Assistance for College and Higher Education

("TEACH") Grant Program. (SAC ¶ 2.) The program is part of the College Cost Reduction and Access Act, and awards grants to college students who agree to pursue a career teaching certain subjects in underserved areas. (*Id*. n.1 at 380[1], citing 20 U.S.C. § 1070g-2.) The program provides grants of up to $4,000 per year to students completing course work needed to begin teaching careers in high-need subject areas, such as "bilingual education and English language acquisition, foreign language, mathematics, reading [assistance], science, and special education[.]" (*Id*. ¶¶ 173-74.) Undergraduate students are eligible for up to $16,000 in grants, while students in graduate study programs may receive up to $8,000 toward their tuition. (*Id.* ¶ 173.)

Students who wish to participate in this program must enter into an agreement, referred to in the pleadings as the "Agreement to Serve," with defendant Department of Education ("DOE"). (*Id*. ¶¶ 4, 175, Ex. A, B.) It is undisputed that PHEAA is not a party to these agreements. Pursuant to the Agreement to Serve, students are obligated to teach in a high-need field at an elementary school, secondary school, or educational service agency that serves students from low-income families, for at least four complete academic years within the first eight years after graduation. (*See id*. ¶¶ 17, 175-76.) Students are also required to "submit evidence of such employment in the form of a certification by the chief administrative officer of the school upon completion of each year of such service[.]" (*Id*. ¶¶ 18, 177, quoting 20 U.S.C. § 1070g-2(b)(1)(D).) If, for any reason, a student participating in the TEACH Grant Program fails to fulfill his or her obligations under the Agreement to Serve, the grant is converted to an unsubsidized loan that the student/graduate must repay. (*Id*. ¶¶ 2, 178.)

---

[1] All page numbers are to the page identification number generated by the Court's electronic docketing system.

B.  **Administration Agreement**

The DOE contracted with PHEAA to be the exclusive servicer of the TEACH Grants beginning July 2013.[2] (*Id.* ¶ 3.) As of June 30, 2015, PHEAA was responsible for servicing approximately $444,500,000 in TEACH Grants. (*Id.*) PHEAA's duties and obligations as the servicer of these grants are governed by the agreement entered into between PHEAA and DOE. (Mot., Ex. 1 ["Administration Agreement"].) PHEAA's duties consist of tracking the TEACH participant's fulfillment of their obligations under the Agreement to Serve, including receiving and processing paperwork, handling billing and payments, and communicating with the participants. (SAC ¶¶ 179-80.) Pertinent to the present action, it was PHEAA's responsibility to convert a TEACH Grant to a loan if the student participant failed to carry out his or her contractual obligations under the Agreement to Serve. (*See id.* ¶ 181.)

C.  **Plaintiffs' Class Lawsuit, Claims, and Allegations**

According to the SAC, plaintiffs were all participants in the TEACH Grant Program who graduated from undergraduate or graduate study programs in education, and began teaching high-demand subjects in low-income schools. (*Id.* 154-66.) Despite the fact that plaintiffs have fulfilled, or are in the process of fulfilling, their service obligations, they allege that PHEAA illegally converted their TEACH Grants to loans. (*Id.* ¶¶ 11-13, 154-66, 204.) They seek to represent a class of people who have received a TEACH Grant serviced by PHEAA between July 2013 and the present, and who produced documentation demonstrating that they have or are

---

[2] PHEAA "established FedLoan Servicing . . . to support the [DOE's] ability to service these loans[.]" (SAC ¶ 168.) The SAC uses "PHEAA" and "FedLoan" interchangeably when referring to the moving defendant. The distinction makes no difference to the Court's consideration of the pending dispositive motion.

3

in the process of fulfilling their service obligations yet had their grant converted to an interest-bearing loan. (*Id*. ¶ 206.)

Plaintiffs filed the present action against DOE and PHEAA in federal court on January 6, 2017. The SAC contains three claims. Count I raises a claim of racketeering against PHEAA under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961(4). Count II is a breach of contract claim brought solely against DOE, and Count III is brought against both defendants and sounds in the tort of common law unjust enrichment.

According to the SAC, DOE and PHEAA engaged in two types of unlawful conversion of plaintiffs' property. The first type of conversion

> deals with the annual certifications that the teachers are to submit to [PHEAA]. The requirements of the "annual certification" require the TEACH Grant recipient to "provide my TEACH Grant servicer with documentation of that service on a form that will be available from my TEACH Grant servicer. This documentation must be completed "every year." However, the terms "year" and "annual" are not defined. The annual certification language in the Agreement to Serve does not require the TEACH Grant recipient to submit "annual" certification within the "school year" as defined by the Agreement to Serve, but simply requires the "annual" certification to be completed "every year" after the completion of each school year. Defendants arbitrarily created deadlines for these certifications and unscrupulously converted teacher's Grants because of a missed arbitrary deadline, despite the teachers continuing to teach in the targeted districts.

(*Id*. ¶ 12.) The second type of conversion alleged occurs when PHEAA

> switches [TEACH Grant recipients] to a "paperless" option without their knowledge. In certain cases, [PHEAA] would send correspondence by regular mail or personal email, but only send reminders about the yearly certification through this "paperless portal" without the teacher's knowledge and without notifying them. The Agreement to Serve (examples are attached as Exhibit A and B) states that these certification forms are to be available through the [DOE]. In some cases, without the Teacher's knowledge, [PHEAA] would switch from regular mailing or sending them to teachers via their personal emails of these forms to paperless mailing through [PHEAA's] "paperless portal." Thus, certain plaintiffs would receive no notification of the certification forms until after the form was already deemed late by Defendants, resulting in the Grant being

4

converted to a loan while the teachers continued to teach in the targeted districts. (*Id.* ¶ 13.)

The SAC sets forth examples of each type of conversion. As to the second type, the SAC recounts that plaintiff Lindsey Jones ("Jones") received $8,000 in TEACH Grants. During the third year of her required service, PHEAA switched Jones to paperless billing "without her permission." (*Id.* ¶¶ 123, 126.) "Because she was switched from paper billing to paperless billing, Ms. Jones missed Defendants' arbitrary deadline to send certification forms." (*Id.* ¶ 127.) Her grant was subsequently converted to a loan.

The circumstances of plaintiff Ashley Ford ("Ford") are representative of the first type of claimed conversion. Ford received $7,000 in TEACH Grants over a three year period. In her second to last year of service, PHEAA "fraudulently converted her grants into loans for allegedly failing to submit her certification paperwork." (*Id.* ¶¶ 16, 25.) Ford received the certification paperwork while on maternity leave, and admits that she "inadvertently left a single signature from the paperwork." (*Id.* ¶¶ 26, 27.) She eventually sent in a second set of paperwork, but, due to what she describes as a "minute inadvertence" in her first set of paperwork, PHEAA converted her grant to a loan.[3] (*Id.* ¶ 31.) She attempted to resolve the matter with PHEAA through this appeal process but was unsuccessful in getting the loan converted back into a grant. (*Id.* ¶¶ 30-6.) According to the SAC, Ford's experience is a

> quintessential example of PHEAA's scheme to defraud teachers—wait for any minute mistake, then convert the Grant into a Loan—charging years of accrued interest, and then make it absolutely impossible to resolve the dispute, despite actual knowledge that a teacher is continuing to fulfill their obligations.

---

[3] Some plaintiffs simply sent in properly completed paperwork beyond the "arbitrary deadline" set by PHEAA, and had their grants converted into loans because their paperwork was submitted in an untimely fashion. (*See, e.g.,* SAC ¶¶ 71-73.)

(*Id.* ¶ 39.)

The SAC represents the second time plaintiffs have attempted to amend their complaint allegations. The filing of each complaint has been immediately met by a motion to dismiss filed by PHEAA. (*See* Doc. Nos. 6, 12, 22.) The motion presently before the Court seeks to dismiss Count I in its entirety and Count III as against PHEAA.

**II. STANDARD OF REVIEW**

PHEAA brings its motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. In reviewing a complaint in the context of a motion to dismiss under Rule 12(b)(6), the Court must construe the complaint in the light most favorable to plaintiffs and accept all well-pleaded material allegations in the complaint as true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).

The sufficiency of the complaint is tested against the notice pleading requirements of Fed. R. Civ. P. 8(a)(2), which provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Although this standard is liberal, Rule 8 still requires a complaint to provide the defendant with "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true," to state a plausible claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

unlawfully.'" *Id*. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief[.]'" *Id*. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). In such a case, the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [and the] complaint must be dismissed." *Twombly*, 550 U.S. at 570; *see Iqbal*, 556 U.S. at 683 (citation omitted).

A complaint need not set down in detail all the particulars of a plaintiff's claim. However, "Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79 (This standard requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 678 (citing *Twombly*, 550 U.S. at 555); *see Gregory v. Shelby Cty.*, 220 F.3d 433, 446 (6th Cir. 2000) (the court should not accept conclusions of law or unwarranted inferences couched in the form of factual allegations). The complaint "must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988) (emphasis in original) (internal quotations marks, citation, and additional citations omitted), *abrogated on other grounds by Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 121 S. Ct. 1835, 149 L. Ed. 2d 855 (2001).

Because plaintiffs' federal RICO claim requires proof of mail or wire fraud as an element, the plaintiffs must also satisfy the heightened particularity requirements of Federal Rule of Civil Procedure 9(b) with respect to the elements of fraud. Therefore, the plaintiffs must, at a

minimum, "'state with particularity the circumstances constituting fraud or mistake.'" *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012) (quoting Fed. R. Civ. P. 9(b)). This includes alleging the "time, place, and content" of the fraudulent acts, the existence of a fraudulent scheme, the intent of the participants in the scheme, and "the injury resulting from the fraud." *Id.* (quotation marks and citations omitted); *see Bender v. Southland Corp.*, 749 F.2d 1205, 1216 (6th Cir. 1984) (upholding the district court's dismissal of RICO claims where the complaint failed to plead fraud with adequate particularity).

Rule 9's pleading requirement of particularity must be read in harmony with Rule 8's "policy of simplicity in pleading[.]" *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 679 (6th Cir. 1988) (citing Fed. R. Civ. P. 8). Accordingly, courts should not be "too exacting" or "demand clairvoyance from pleaders" in determining whether the requirements of Rule 9(b) have been met. *Id.* at 681. Rather, "if the defendant has fair notice of the charges against him, [Rule 9(b)] is satisfied." *Shapiro v. Merrill Lynch & Co.*, 634 F. Supp. 587, 594 (S.D. Ohio 1986); *see Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012) ("'Rule [9] requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim.'") (quoting *Michaels Bldg.*, 848 F.2d at 680).

In entertaining a Rule 12(b)(6) motion, a court may consider documents that are referred to in the pleadings and are integral to the claims without converting the motion into one for summary judgment. *See Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)); *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335-36 (6th Cir. 2007) (citation omitted); *see also Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997) (court may consider documents that

govern a party's rights and are necessarily incorporated by reference in the complaint on a motion to dismiss) (citations omitted).

### III. DISCUSSION

In its dispositive motion, PHEAA argues that plaintiffs' RICO and unjust enrichment claims fail because they are each grounded in the Agreement to Serve, and the allegations supporting these claims are inseparable from the allegations giving rise to plaintiffs' breach of contract claim. PHEAA argues further that plaintiffs' RICO claim fails to meet the heightened pleading requirements for fraud.

#### A. RICO § 1962(c)

In order to demonstrate a RICO violation under 18 U.S.C. § 1962(c), a plaintiff must establish the following elements: (1) the existence of two or more predicate offenses, (2) the existence of an "enterprise," (3) a nexus between the pattern of racketeering and the enterprise, and (4) an injury to business or property occurring as a result of the racketeering activity. *VanDenBroeck v. CommonPoint Mortg. Co.*, 210 F.3d 696, 699 (6th Cir. 2000) (citing *Frank v. D'Ambrosi*, 4 F.3d 1378, 1385 (6th Cir. 1993)), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 128 S. Ct. 2131, 170 L. Ed. 2d 1012 (2008); *see Sivak v. United Parcel Serv. Co.*, 28 F. Supp. 3d 701, 719 (E.D. Mich. 2014) (setting forth the elements as "'(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity[]'") (quoting *Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006) (further citations omitted)), *abrogated on other grounds by Solo v. United Parcel Serv. Co.*, 819 F.3d 788 (6th Cir. 2016).

Plaintiffs plead the existence of traditional mail and wire fraud as the predicate acts for

their RICO claim. "Mail fraud consists of (1) a scheme to defraud, and (2) use of the mails in furtherance of the scheme." *United States v. Jamieson*, 427 F.3d 394, 402 (6th Cir. 2005) (citation omitted). "The elements of wire fraud are essentially the same except that one must use the wires in furtherance of the scheme to defraud." *Heinrich,* 668 F.3d at 404 (citation omitted). "A plaintiff must demonstrate *scienter* to establish a scheme to defraud, which is satisfied by showing the defendant acted either with a specific intent to defraud or with recklessness with respect to potentially misleading information." *Sivak*, 28 F. Supp. 3d at 720 (emphasis in the original) (citing *United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998)).

### 1. *Scheme to Defraud*

Among many arguments offered as to why plaintiffs' RICO claim should be dismissed, PHEAA asserts that the claim is fatally flawed because it fails to properly allege a scheme to defraud, a necessary element of mail and wire fraud. "A scheme to defraud includes any plan or course of action by which someone uses false, deceptive, or fraudulent pretenses, representations, or promises to deprive someone else of money." *Jamieson*, 427 F.3d at 402 (citation omitted). With respect to the alleged misrepresentations, Rule 9(b)'s heightened pleading requirements are met where the plaintiff is able to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008) (further quotation marks and citation omitted).

According to PHEAA, the SAC fails to set forth a scheme to defraud, as a matter of law, because it does not allege *any* fraudulent statements made by it, let alone any deceptive statements that are pleaded with the requisite heightened pleading requirement of Rule 9(b). It

maintains that plaintiffs merely allege that PHEAA "fraudulently converted" their grants into loan, and argues that a "mere breach of contract can never provide the basis for the predicate acts of mail or wire fraud." (Mot. at 512.)

In *Blount Fin. Servs., Inc. v. Walter E. Heller & Co.*, the Sixth Circuit dismissed a RICO claim "arising from a financing contract" where the plaintiff alleged that the defendant "charged a rate of interest which was illegal under the contract between the parties." 819 F.2d 151, 152-53 (6th Cir. 1987). The court observed that:

> The fact that the parties take different positions under the contract as to the appropriate prime rate, or the fact that the defendant charged too high a "prime rate" and thereby concealed or refused to disclose what the plaintiff considers the true prime rate called for under the contract, does not give rise to a valid claim for fraud. *Fraud alleged in a RICO civil complaint for mail fraud must state with particularity the false statement of fact made by the defendant which the plaintiff relied on and the facts showing the plaintiff's reliance on defendant's false statement of fact. The plaintiff has not alleged with particularity any such false statement of fact and therefore the District Court was correct in dismissing the complaint.* Sending a financial statement which misconstrues the prime rate provided by the terms of the contract may breach the contract but it does not amount to a RICO mail fraud cause of action.

*Id*. (emphasis added).

In a later decision, the Sixth Circuit clarified that "*Blount* does not stand for a blanket prohibition of RICO claims related to contract disputes." *Dana Corp. v. Blue Cross & Blue Shield Mut. of N. Ohio*, 900 F.2d 882, 885 (6th Cir. 1990). In *Dana*, plaintiff entered into a contract with Blue Cross whereby Blue Cross was to administer Dana Corp.'s benefits plan. Under the terms of the contract, Blue Cross was to issue a refund to Dana if it exceeded certain cost limitations. Dana alleged that Blue Cross never adjusted its charges but represented in meetings that Dana was receiving the benefit of such cost adjustments. *Id*. Distinguishing *Blount*, the court observed "the reason for dismissal in *Blount* was that the plaintiff failed to make

sufficient allegations of misrepresentations or omissions which were reasonably calculated to deceive persons of ordinary prudence and comprehension." *Id*. at 885 (internal quotation marks and citation to *Blount, supra* omitted). "In contrast, Dana has made such allegations of misrepresentations and omissions by Blue Cross." *Id*.

Plaintiffs posit that the SAC "clearly spells out the scheme to defraud in paragraph 233 stating 'PHEAA's scheme to defraud consists of knowingly converting TEACH Grants into loans despite actual knowledge that the Plaintiffs continue to fulfill their Qualifying Teaching requirements.'" (Opp'n at 574, quoting SAC ¶ 233.) This complaint allegation merely serves to underscore the deficiency in this claim, as "knowingly converting" grants to loans, without some fraudulent misrepresentation or omission, fails to state a scheme to defraud.[4]

Plaintiffs also point to paragraph 226 that alleges that PHEAA "'illegally and intentionally later converted Plaintiffs' Grants to interest bearing loans due to minute and hyper technical reasons, arbitrary annual deadlines, and underhanded tactics like sending certification information via the [PHEAA] website so that Teachers would miss PHEAA's arbitrary deadlines.'" (Opp'n at 574, quoting SAC ¶ 226.) The fact that plaintiffs take issue with PHEAA's interpretation of the contract deadlines may give rise to a contract disputes, but it does not give rise to a fraud claim, nor does a dispute over the legal significance of the delays by

---

[4] With respect to the first type of conversion, there are vague references to communications sprinkled throughout the SAC, but none are plead with any particularity. For example, the only representations identified in the SAC relating to plaintiff Ford are several representations made by unknown employees or representatives of PHEAA, on unidentified dates, *after* plaintiff Ford submitted her initial set of paperwork with the missing signature. (*See* SAC ¶¶ 30-35.) Also, it is alleged that plaintiff Samantha Binnie ("Binnie") performed her required service at an orphanage in Colombia and was advised by an unknown representative of PHEAA that she could fill out the required paperwork when she returned to the United States, "like taxes." (SAC ¶ 110.) These representations are not pled with particularity under Rule 9(b) as they do not identify the speaker or where and (with respect to Ford) when the statements were made. Further, these statements are not alleged to have been fraudulent, nor was it alleged that these plaintiffs relied upon the representations to their detriment. *See Bender*, 749 F.2d at 1216.

plaintiffs in submitting certification paperwork.

At best, plaintiffs have alleged that the DOE, through PHEAA, breached the Agreement to Serve by converting the grants to loans despite plaintiffs' substantial compliance with the terms of the agreement.[5] Breaches of contract, even if they are part of "some illegal schemes perpetrated using the mails and wires are not violations of the federal wire and mail fraud statutes." *Hilton Sea, Inc. v. DMR Yachts, Inc.*, 750 F. Supp. 35, 39 (D. Me. 1990) (citation omitted); *see, e.g., C & L Ward Bros., Co. v. Outsource Solutions, Inc.*, No. 11-cv-14773, 2012 WL 3157005 (E.D. Mich. Aug. 3, 2012) (dismissing RICO mail fraud claim based on the submission of improper billings that violated the parties' contract); *Kevelighan v. Trott & Trott, P.C.*, 771 F. Supp. 2d 763, 777 (E.D. Mich. 2010) (dismissing RICO mail fraud claims, noting that a plaintiff cannot "transmute claims sounding in contract into RICO claims by simply adding the terms 'false' and 'fraudulent'") (quotation marks and citations omitted). For this reason alone, plaintiffs' RICO claim is subject to dismissal.[6]

### 2. *The RICO Enterprise*

The SAC identifies the DOE and PHEAA as the "RICO enterprise[.]" (SAC ¶ 220, bolding omitted.) With respect to this "enterprise" element, the SAC further alleges that

---

[5] The Court makes no determination, at this time, as to whether plaintiffs have established a breach of the Agreement to Serve. Such a determination is better left for summary judgment or trial.

[6] While the first type of conversion does not involve any material misrepresentations, the second type comes closer to alleging a scheme to defraud. It would be fair to read the SAC as alleging that PHEAA made a material omission when it switched from paper notification to the paperless portal "without notifying [plaintiffs]." (SAC ¶ 13; *see also* ¶ 226 [PHEAA engaged in "underhanded tactics like sending certification information via the [PHEAA] website so that Teachers would miss PHEAA's arbitrary deadlines."].) Nonetheless, as discussed *infra*, even this second theory of conversion fails to set forth a federal RICO claim because it does not identify racketeering activity prohibited by RICO.

"PHEAA did conduct and participate in the conduct of the Enterprise through a pattern of racketeering activity for the unlawful purpose of intentionally defrauding Plaintiffs by illegally converting their loans despite actual knowledge of substantial compliance." (*Id.* ¶ 225.) According to the SAC, "[t]he acts of fraudulently converting Plaintiffs' and thousands of other teacher[s'] TEACH Grants into loans constitutes collection of an unlawful debt pursuant to 18 U.S.C. § 1962(c)." (*Id.* ¶ 237.)

PHEAA disagrees and argues that the SAC has not set forth a type of activity that is prohibited under RICO. Sections 1961(6) defines just two types of unlawful debt that are actionable under RICO. The first category is debt incurred or contracted in a gambling activity illegal under state or federal law, or those debts unenforceable under federal or state usury law. 18 U.S.C. § 1961(6)(A). The second category are those debts incurred in connection with the business of gambling in violation of federal or state law or the business of lending money of a thing of value at usurious rates, where those rates are at least double the enforceable rate. 18 U.S.C. § 1961(6)(B). The fact pattern set forth in the SAC does not support a finding that either type of unlawful debt was being collected. Accordingly, the RICO claim is improperly pled for this additional reason.

### B. Unjust Enrichment[7]

In Count III, plaintiffs allege that defendants "have been unjustly enriched by receiving increased profits based on increased outstanding loan balances at the expense of Plaintiffs and

---

[7] Though they do not discuss choice of law in the briefing, both plaintiffs and PHEAA rely on Ohio law to support their respective positions as to plaintiffs' unjust enrichment claim. The Court will also assume that, for purposes of the present motion, Ohio law applies to plaintiffs' state law claims.

Class members." (SAC ¶ 255.) PHEAA argues that plaintiffs' unjust enrichment claim fails because Ohio law precludes recovery under the theory of unjust enrichment or quasi-contract when an express contract covers the same subject. Plaintiffs counter that, at this stage in the proceedings, they have a right to pursue both a contract and unjust enrichment claim as alternative forms of relief.

Unjust enrichment arises out of a contract implied in law. *Hummel v. Hummel*, 14 N.E.2d 923, 925-26 (Ohio 1938). A "contract implied in law" is not a true contract, but is a quasi-contract implied by a court when a party "retains money or benefits which in justice and equity belong to another." *Id*. at 926-27. Ohio law does not allow parties to seek damages under quasi-contractual theories of recovery, such as a claim of unjust enrichment, when a contract governs the relationship. *Wolfer Enter., Inc. v. Overbrook Dev. Corp.*, 724 N.E.2d 1251, 1253 (Ohio Ct. App. 1992) (citations omitted); *see Ullmann v. May*, 72 N.E.2d 63, syllabus ¶ 4 (Ohio 1947). A claim for unjust enrichment may be pled in the alternative, however, when the existence of an express contract is in dispute and may also be maintained despite the existence of an express contract where there is evidence of fraud, bad faith, or illegality. *Res. Title Agency, Inc. v. Morreale Real Estate Servs., Inc.*, 314 F. Supp. 2d 763, 772 (N.D. Ohio 2004) (citations omitted).

As set forth above, plaintiffs have failed to allege a scheme to defraud. Moreover, PHEAA notes that plaintiffs do not allege that the Agreement to Serve is invalid and, in fact, rely on its enforceability to support their breach of contract claim against the DOE. Further, PHEAA does not challenge the enforceability of either contract, and, indeed, relies on the related Administration Agreement to defend its actions. Still, plaintiffs underscore the fact that PHEAA

is not a party to the Agreement to Serve. "While such claims are generally precluded, '[c]ircumstances may exist to support an unjust enrichment claim against a non-contracting party who benefits from the uncompensated work of one of the parties to the contract.'" *Id*. at 772 (quoting *Nationwide Heating & Cooling, Inc. v. K & Constr.*, No. 87AP-129, 1987 WL 16802, at *2 (Ohio Ct. App. Sept. 10, 1987)). For example, "in the construction context, Ohio Courts have held that, when a subcontractor is not paid by the contractor and the owner has not paid the contractor for the aspect of the job at issue, the subcontractor can recover from the owner on a theory of unjust enrichment." *Id*. at 772-73 (collecting cases).

Here, however, plaintiffs are not alleging that PHEAA was a mere third party beneficiary of the contract between the DOE and plaintiffs. Instead, plaintiffs maintain that PHEAA was the conduit through which the DOE breached the terms of the express contract. (SAC ¶ 252 ["Despite Plaintiffs and Class members substantially complying with the contract the *[DOE], through PHEAA, breached its contractual obligations* by improperly converting the grants to interest-bearing loans."], emphasis added.) In fact, plaintiffs make clear that their injury flows from "PHEAA's improper conduct in breaching the contract . . . due to the improper conversion of the TEACH Grant[.]" (*Id*. ¶ 253.) Plaintiffs' breach of contract and unjust enrichment claims both rely on the same conduct: namely, PHEAA's conversion of the federal grants to loans. Both claims are also dependent on the existence and validity of the Agreement to Serve. Therefore, plaintiffs have failed to allege sufficient facts to support an unjust enrichment claim to be pled in the alternative. *See Bihn v. Fifth Third Mortg. Co*., 980 F. Supp. 2d 892, 905 (S.D. Ohio 2013) (unjust enrichment claim could not be pled in the alternative where the parties did not dispute the existence of the contract).

Moreover, plaintiffs have failed to properly allege that they have conferred a benefit upon PHEAA. It is well settled that the elements of unjust enrichment include: "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment[.]" *Hambleton v. R.G Barry Corp.*, 465 N.E.2d 1298, 1302 (Ohio Ct. App. 1984) (quoting *Hummel*, 14 N.E.2d at 927 (1938)). "As ordinarily defined, the concept of unjust enrichment includes not only gain on one side but loss on the other, with a tie of causation between them." *Shonac Corp. v. AMKO Int'l, Inc.*, 763 F. Supp. 919, 945 (S.D. Ohio 1991) (quoting 18 O. Jur. 3d Contracts § 343, p. 271). "As a result, in order to assert an unjust enrichment claim, a plaintiff must establish that a benefit has been conferred upon that defendant *by that particular plaintiff*." *Bihn*, 980 F. Supp. 2d at 904 (citing *Johnson v. Microsoft Corp.*, 834 N.E.2d 791 (Ohio 2005) (further citation omitted) (emphasis added)); *see also Gaier v. Midwestern Grp.*, 601 N.E.2d 624, 628 (Ohio Ct. App. 1991) ("It is the existence of a substantial detriment to the plaintiff, causally connected to a substantial benefit to the defendant, that makes it inequitable for the defendant to retain the benefit at the plaintiff's expense").

The only benefit PHEAA is alleged to have received from its perceived misconduct clearly did not come from plaintiffs. Specifically, the SAC explains that PHEAA is paid $1.05 by DOE to service each borrower in TEACH Grant "status[,]" but receives $3.85 for grants that have been converted into loans. (SAC ¶ 186.) According to the SAC, it is this increased fee that has "incentivized [PHEAA] to deny Certification Forms and wrongly convert the" grants into loans. (*Id.* ¶ 187.)

Plaintiffs argue that they are really the ones conferring the benefit upon PHEAA

17

"because they are . . . bridled with the repayment of an interest bearing loan[.]" (Opp'n at 578.) In reality, however, any benefit PHEAA received in the form of additional fees was dictated by Administration Agreement and came from the DOE, and plaintiffs do not suggest otherwise. "The purpose of recovery under a theory of unjust enrichment is not to compensate the aggrieved party for any loss or damage suffered by him, but to compensate him for the benefit he has conferred on the other party." *Budai v. Euclid Spiral Paper Tube Corp.*, No. 96CA0046, 1997 WL 28111, at *7 (Ohio Ct. App. Jan. 22, 1997) (citing *Hughes v. Oberholtzer*, 123 N.E.2d 393, 397 (Ohio 1954)); *see Gerboc v. ContextLogic, Inc.*, 867 F.3d 675, 678 (6th Cir. 2017) ("Unjust enrichment is 'designed to compensate [a] plaintiff for the benefit he has conferred upon another, not to compensate him for a loss suffered.'") (quoting *Wuliger v. Mfrs. Life Ins. Co.* 567 F.3d 787, 799 (6th Cir. 2009) (further quotation marks and citation omitted)).

In *Bihn*, the court was faced with a somewhat analogous situation. There, plaintiff alleged that a mortgage company was unjustly enriched when it received fees and costs associated with improperly instituting foreclosure of the plaintiff's property. The court dismissed the claim, in part, because plaintiff failed to allege that the fees and expenses the mortgage company received for the foreclosure were paid by the plaintiff property owner. *Bihn*, 980 F. Supp. 2d at 906 (noting that "[n]owhere in the Complaint . . . does [plaintiff] allege that she actually paid these fees and expenses"). Similarly here, the only factual allegation that supports the unjust enrichment claim is plaintiffs' allegation that PHEAA received additional compensation when it converted a grant to a loan. Nowhere in the SAC do plaintiffs allege that they paid these additional fees. Accordingly, plaintiffs have failed to satisfy a necessary element of a *prima facie* case of unjust enrichment, and that claim must be dismissed as against PHEAA.

## IV. CONCLUSION

For all of the foregoing reasons, PHEAA's motion to dismiss is granted. Count I of the SAC is dismissed in its entirety, and Count III is dismissed as against PHEAA.

Dated: March 19, 2018

**HONORABLE SARA LIOI
UNITED STATES DISTRICT JUDGE**